IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.  Criminal Action No. 3:16-cr-00009-JAG

JAMES WILLIAM HILL, III,
         Defendant.

## OPINION

A jury convicted the defendant, James William Hill, III, of violating the Matthew Shepard-James Byrd, Jr. Hate Crimes Prevention Act (the "HCPA" or the "Act"). The jury found that Hill willfully injured a co-worker, C.T., while C.T. packed boxes at an Amazon facility in Chester, Virginia, due to C.T.'s actual or perceived sexual orientation. Hill now moves for judgment of acquittal, arguing that the government cannot constitutionally prosecute him under the HCPA, and therefore the Court should set aside his conviction.

After considering the facts adduced at trial, the Court finds that, as a matter of law, the HCPA as applied to Hill exceeds Congress's power under the Commerce Clause. Accordingly, Hill's conviction under the Act cannot stand, and the Court grants his motion for acquittal.

## I. BACKGROUND

On May 22, 2015, Hill and the victim, C.T., worked at the Amazon Fulfillment Center[1] in Chester, Virginia. Hill worked as a "re-binner," taking items from conveyor belts and placing them into bins in a wall. (Tr. 119.) C.T. worked as a "packer," moving items from these wall bins into boxes for packaging, then placing the boxes on a conveyor belt to move to the next department. (Tr. 117.) Shortly into their ten-hour work shifts, Hill approached C.T. without

---

[1] Amazon is an online retailer, (Tr. 147), and an Amazon fulfillment center is essentially a warehouse in which Amazon packages items to ship to customers, (Tr. 116–17).

provocation and hit him several times in the face with his fists, making no statement during the assault. (Tr. 122–28, 161.) C.T. went to Amazon's in-house clinic for treatment, and clinic staff recommended he go to the nearest hospital, which C.T. did. (Tr. 128–30.) C.T. did not return to work, missing the majority of his shift. (Tr. 134.) Hill indicated to both Randel Baker, an Amazon loss prevention specialist, and Chesterfield County Police Officer Ryan Upton that he assaulted C.T. because of C.T.'s sexual orientation. (Tr. 151, 181.)

Amazon shut down the area in which the incident occurred for approximately 30–45 minutes to clean blood off the floor. (Tr. 162, 227, 229.) The assistant manager on duty testified that other areas of the facility absorbed the work, and her team did not miss any "critical pull times," or deadlines by which they needed to package orders to reach the customers in time. (Tr. 218, 227–28, 232.) Although C.T. did not return to the production line, Hill's expert, Dr. Jonathan Whitaker, testified that Amazon performed no differently during the May 22 shift than during any other shift that month.[2] (Tr. 272.) According to Dr. Whitaker, Amazon shipped 3.3 late packages[3] out of about 48,000 during that shift, which matches the company's performance throughout May of 2015. (Def. Exh. 4A; Tr. 257–61.) Amazon shipped 99.9931% of orders on time during the shift at issue, 99.9932% on time for the shift immediately following, and 99.9939% on time during May. (Def. Exh. 4A; Tr. 255.) Finally, Amazon maintained its performance on May 22 without increased costs, such as overtime. (Tr. 269, 272.)

The Commonwealth of Virginia initially charged Hill with misdemeanor assault and battery in state court. On May 29, 2015, however, the state prosecutor requested the United

---

[2] Dr. Whitaker did not have an opinion regarding how the assault affected C.T.'s performance specifically. (Tr. 277–78.)
[3] Dr. Whitaker explained that this is not a whole number because he derived it from data that Amazon provided, which rounded percentages to a certain decimal place. (Tr. 258.) He noted that if he extended the Amazon percentages past the ten-thousandths digit, the number likely would have been 3 instead of 3.3. (*Id.*)

2

States "assume prosecution of this case as a hate crime" in part because Virginia's hate crime statute does not cover crimes based on sexual orientation. (Dk. No. 21, Exh. 2.) On July 24, 2015, the United States Attorney General certified that Hill's prosecution under the HCPA "is in the public interest and is necessary to secure substantial justice." (Dk. No. 17, Exh. B.) The Commonwealth dropped the misdemeanor assault charge in favor of federal prosecution, and a federal grand jury indicted Hill under the HCPA.

Hill moved to dismiss the indictment, arguing that the Court should deem the HCPA unconstitutional as an invalid exercise of Congress's commerce power. The Court dismissed the indictment, finding the HCPA unconstitutional as applied to Hill. The Fourth Circuit reversed and remanded that decision, holding that this Court should first develop facts regarding whether Hill's actions substantially affected interstate commerce.

Following remand, this Court held a jury trial beginning on January 22, 2018. During the trial, the Court allowed the government to amend the indictment to charge that, in connection with punching C.T. due to C.T.'s sexual orientation, Hill "interfered with commercial and other economic activity in which C.T. was engaged at the time of the conduct." (Dk. No. 96.) The Court instructed the jury that the government must prove that Hill (1) caused bodily injury to C.T.; (2) willfully; (3) because of C.T.'s actual or perceived sexual orientation; and (4) that the conduct in the first three elements interfered with commercial or economic activity in which C.T. was engaged when the incident occurred. The jury found Hill guilty. Hill moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, again arguing that the HCPA cannot constitutionally apply to his assault on C.T.

## II. DISCUSSION[4]

The HCPA punishes certain hate crimes. 18 U.S.C. § 249. Section 249(a)(2), at issue in this case, focuses on hate crimes based on "actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability." 18 U.S.C. § 249(a)(2). Congress passed this subsection based on its power under the Commerce Clause. *See United States v. Jenkins*, 909 F. Supp. 2d 758, 766 (E.D. Ky. 2012).

To obtain a conviction under § 249(a)(2), the government must prove (1) that the defendant willfully caused bodily injury to another person, or attempted to cause bodily injury by using a dangerous weapon; (2) that the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of the victim served as the "but-for cause" of the assault; and (3) that the conduct falls within a "circumstance described in subparagraph (B)." 18 U.S.C. § 249(a)(2)(A); *see United States v. Miller*, 767 F.3d 585, 594 (6th Cir. 2014). "[S]ubparagraph (B)" states as follows:

> [T]he circumstances described in this subparagraph are that—
> (i) the conduct . . . occurs during the course of, or as the result of, the travel of the defendant or the victim—
>     (I) across a State line or national border; or
>     (II) using a channel, facility, or instrumentality of interstate or foreign commerce;

---

[4] Under Federal Rule of Criminal Procedure 29, if the jury returns a guilty verdict, "the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Acquittal is proper under Rule 29 if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003) (quoting *Smalls v. Pennsylvania*, 476 U.S. 140, 144 (1986)). In considering the motion, a court must determine "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). Courts must consider (1) the elements of the offense charged, and (2) the factual sufficiency of the evidence. *United States v. Alerre*, 430 F.3d 681, 692 n.13 (4th Cir. 2005).

> (ii) the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct . . . ;
> (iii) in connection with the conduct . . . , the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or
> (iv) the conduct . . . –
>> (I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or
>> (II) otherwise affects interstate or foreign commerce.

18 U.S.C. § 249(a)(2)(B). In this case, the government prosecuted Hill under subsection (iv)(I), requiring it to prove that Hill's assault interfered with C.T.'s commercial or economic activity.

Finally, to "ensure the federal government will assert its . . . hate crimes jurisdiction only in a principled and properly limited fashion," *Jenkins*, 909 F. Supp. 2d at 773 (quoting H.R. 86, 111th Cong. (1st Sess. 2009)), Congress included a certification requirement. Specifically,

> No prosecution of any offense described in this subsection may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that–
> (A) the State does not have jurisdiction;
> (B) the State has requested that the Federal Government assume jurisdiction;
> (C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or
> (D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

18 U.S.C. § 249(b)(1).

### A. The Certification Requirement

In his motion to dismiss the indictment, Hill challenged the certification in this case, and asked the Court to find that the government failed to meet the requirement that this prosecution "is in the public interest and necessary to secure substantial justice." 18 U.S.C. § 249(b)(1)(D). His Rule 29 motion did not address this argument, but Hill confirmed at the hearing that he does not waive his challenge to the certification requirement. The Court decides the issue the same

5

way it did when Hill moved to dismiss the indictment, and incorporates its prior ruling in this Opinion for purposes of appeal. The Court finds that it can review the HCPA's certification requirement, and concludes that the government meets that requirement in this case.

The Fourth Circuit has not addressed the reviewability of certification under the HCPA. In a similar case, however, the Fourth Circuit held that courts can review the certification of a juvenile for trial in federal court. *United States v. Juvenile Male No. 1 (Juvenile Male)*, 86 F.3d 1314, 1319 (4th Cir. 1996). The juvenile transfer statute requires the Attorney General to certify the propriety of proceeding against a juvenile in federal court. 18 U.S.C. § 5032; *Juvenile Male*, 86 F.3d at 1317. Specifically, the Attorney General must:

> certif[y] to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or [one of a number of specified drug or firearm offenses], and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

18 U.S.C. § 5032. In *Juvenile Male*, the Fourth Circuit held that courts "can and must first satisfy [them]selves that [their] jurisdiction has been properly invoked. [Courts] do so by reviewing the stated reasons underlying the government's decision to proceed in federal court." 86 F.3d at 1321. The court found that the "prongs of the certification statute act as limits on the federal courts' jurisdiction to act in this sphere." *Id.* at 1319.

While § 5032 and § 249 are not identical, the similarities in the statutes matter more than the differences. As an initial matter, the certification requirements in both statutes reflect congressional intent "to limit the types of cases that the executive *should* bring in federal court." *Juvenile Male*, 86 F.3d at 1319; *see Jenkins*, 909 F. Supp. 2d at 773 ("One of the stated purposes

of [the certification] requirement [in the HCPA] was to, 'ensure the federal government will assert its new hate crimes jurisdiction only in a principled and properly limited fashion.'" (quoting H.R. 86)). Further, the structures of the statutes mirror each other, listing a handful of specific reasons justifying certification followed by a catch-all. The language of the catch-all provisions varies slightly in that § 5032 looks for "a substantial Federal interest," 18 U.S.C. § 5032, while § 249 requires that the prosecution "[be] in the public interest and necessary to secure substantial justice," 18 U.S.C. § 249(b)(1)(D). Nevertheless, *Juvenile Male* puts the possible reasons justifying certification in § 5032 on the same level, concluding that,

> [i]n the final analysis, whether there is a "substantial Federal interest" in a given case implicates [the court's] authority over the juvenile to the same extent and for many of the same reasons as whether the juvenile is alleged to have violated a federal law, whether that violation is a "crime of violence," or whether the appropriate state authorities have refused to act.

86 F.3d at 1320–21. Regardless of the slight differences in the statues, *Juvenile Male* opens the door to review the Attorney General's certification under the HCPA.[5]

The scope of review, however, is limited. "In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring

---

[5] At the motion to dismiss stage, the government relied on *Jenkins* to urge the Court not to review the certification. Although *Jenkins* found certification unreviewable, that court based its reasoning on binding Sixth Circuit precedent holding that courts should not review certification under § 5032. 909 F. Supp. 2d at 774. Indeed, *Jenkins* cites the Fourth Circuit's decision in *Juvenile Male* "permitt[ing] review of a similar certification requirement," contrasting the Fourth Circuit with "ten other circuits [that] have reached the opposite conclusion." *Id.* Given this distinction and the Fourth Circuit's status as an outlier, *Jenkins* actually supports the idea that courts in the Fourth Circuit should review HCPA certification.

7

before a grand jury, generally rests entirely in his discretion." *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

The Attorney General's decision to certify this case deserves great deference. As *Juvenile Male* recognized, "[w]hether there is a 'substantial Federal interest' [under § 5032] . . . comes closer to the sort of discretionary decision more commonly thought of as the type of prosecutorial decisions that are immune from judicial review." 86 F.3d at 1319. Accordingly, the Court must "give the government's decision in that regard more deference." *United States v. T.M.*, 413 F.3d 420, 425 (4th Cir. 2005) (citing *Juvenile Male*, 86 F.3d at 1319).

In this case, the government meets the certification requirement. The government's decision takes into account the fact that Virginia's hate crime statute does not cover crimes based on sexual orientation, leaving the Commonwealth with the sole option of charging simple assault—an option that does not consider Hill's discriminatory intent. Considering this statutory difference, and giving appropriate deference to the Attorney General's decision to certify this case, this prosecution qualifies as "in the public interest and necessary to secure substantial justice." 18 U.S.C. § 249(b)(1)(D).

### B. The Constitutionality of the HCPA

A jury convicted Hill of violating the HCPA, but the legal question of whether the government could constitutionally prosecute Hill under this statute in the first place remains. *See Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016) (noting that, although the government must prove that a defendant's actions satisfy the commerce element of a statute, a court must decide the meaning of that commerce element as a matter of law). Viewed within the proper constitutional framework, Hill's HCPA conviction cannot stand.

The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has identified three categories of activity that Congress may regulate under its commerce power: (1) "the use of the channels of interstate commerce," such as highways, railroads, ships, and rivers; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce," like vehicles and aircraft; and (3) "those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558–59 (1995) (internal citations omitted); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 271 (1964) (Black, J., concurring).

Section 249(a)(2) does not fall under the first two categories. It addresses violent crime, which does not qualify as a use of interstate commerce channels, an instrumentality of interstate commerce, or a person or thing in interstate commerce. *See United States v. Morrison*, 529 U.S. 598, 609 (2000). The analysis turns, then, on the third category: whether, in Hill's case, the HCPA regulates "activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 559. In *Lopez* and *Morrison*, the Supreme Court prescribed the framework for analyzing statutes falling within the third category. To determine whether the regulated activity substantially affects interstate commerce, courts should consider the statute's (1) economic nature, (2) legislative findings, (3) connection to interstate commerce, and (4) express jurisdictional elements (the "substantial effects test"). *See Morrison*, 529 U.S. at 610–13; *Lopez*, 514 U.S. at 559–65. This test does not create a bright line, but rather provides factors courts should weigh to determine whether a statute, as a whole, regulates activity substantially affecting commerce. *See Morrison*, 529 U.S. at 609–19 (considering the four *Lopez* factors together to determine whether the Violence Against Women Act ("VAWA") substantially affected commerce).

## *1. The HCPA's Economic Nature*

A statute's economic nature can, by itself, render the statute constitutional under the Commerce Clause. *See Lopez*, 514 U.S. at 559–60. In *Morrison*, the Supreme Court observed that it had sustained federal regulation of intrastate activity pursuant to the substantial effects test only when the activity was "some sort of economic endeavor." 529 U.S. at 611. Examples included coal mining, extortionable credit transactions, tourism with interstate components, and production and consumption of homegrown wheat. *Lopez*, 514 U.S. at 559–60. Accordingly, *Lopez* defined the Gun-Free School Zones Act as "a criminal statute that by its terms ha[d] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561. Similarly, when considering the VAWA, *Morrison* held that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." 529 U.S. at 613.

Where a statute does regulate economic activity, the government need only show a *de minimis* effect on commerce for individual violations. *See Gonzales v. Raich*, 545 U.S. 1, 17 (2005) ("[W]hen 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'") (quoting *Lopez*, 514 U.S. at 558). Moreover, while *Morrison* declined to adopt "a categorical rule against aggregating the effects of any noneconomic activity . . . our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."[6] 529 U.S. at 613. The Court "reject[ed] the argument that Congress may regulate

---

[6] *Raich* used aggregation to uphold as "necessary and proper" Congress's regulation of locally grown marijuana for personal use, which some might view as noneconomic activity. 545 U.S. at 22. The Court emphasized, however, that failure to regulate this activity would undermine the Controlled Substances Act ("CSA"), a valid regulation of the commercial interstate drug market. *Id.* Unlike the CSA, the HCPA does not regulate a commercial interstate market.

10

noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. Under this framework, for example, taking red wolves qualifies as economic activity because the crime involves protecting "commercial and economic assets," like livestock and crops. *Gibbs v. Babbitt*, 214 F.3d 483, 492 (4th Cir. 2000). Due to the direct relationship between wolf takings and interstate commerce, courts may aggregate the effects and require only a *de minimis* relation to commerce in individual cases. *Id.* at 493, 498.

Applying these principles to the HCPA, discriminatory crimes of violence do not constitute economic activity. Although the HCPA contains a jurisdictional hook requiring a connection to commercial activity, 18 U.S.C. § 249(a)(2)(B), the statute itself regulates "bias-motivated violence," much like the "noneconomic" VAWA at issue in *Morrison*. *Jenkins*, 909 F. Supp. 2d at 768. Because the HCPA does not regulate economic conduct, the government cannot aggregate the effects of the regulated conduct in this case and cannot successfully argue that a *de minimis* effect on commerce suffices to convict Hill constitutionally.

In an attempt to characterize the HCPA as economic and avoid these hurdles, the government analogizes the HCPA to the decidedly economic Hobbs Act. "Congress' purpose in adopting the Hobbs Act" was "to protect commercial, interstate activity from criminal disruption." *United States v. Taylor*, 754 F.3d 217, 222 (4th Cir. 2014). Unlike the HCPA, the Hobbs Act "criminalizes the 'fundamentally economic' crimes of robbery and extortion." *United States v. Powell*, 693 F.3d 398, 402 (3d Cir. 2012). Because the statute itself regulates commercial activity, the government need only show a minimal effect on commerce in Hobbs Act cases. *E.g., Taylor*, 136 S. Ct. at 2081 (finding that the market for illegal drugs is in itself "commerce over which the United States has jurisdiction," so the government need only show a minimal effect in drug-related robbery cases). In contrast, the HCPA regulates noneconomic,

hate-driven violence, which simply does not compare to robbery's "fundamentally economic" nature. *See Powell*, 693 F.3d at 402.

The government also compares this case to arson cases under 18 U.S.C. § 844(i), but they differ as well. Because arson involves damaging or destroying property, the proper inquiry in those cases concerns the function of the property itself—in other words, whether someone used the property in an activity affecting commerce. *Jones v. United States*, 529 U.S. 848, 854–55, 858 (2000); *see also United States v. Cristobal*, 293 F.3d 134, 145–46 (4th Cir. 2002) (applying functionality test to vehicles in an arson case). Thus, federal arson cases "turn[] on whether the property at issue in th[e] case was actively employed for commercial purposes at the time of the fire." *United States v. Aman*, 480 F. App'x 221, 223 (4th Cir. 2012). If the government can meet that standard, "the connection to interstate commerce is substantial enough to quell any *Lopez*-based concerns." *Id.* By its nature, arson permanently damages or destroys property. The statute that criminalizes arson thus leads to a different constitutional inquiry than the one the HCPA poses about criminalizing discriminatory violence that causes bodily injury.

The HCPA regulates "bias-motivated" violence, and the Court cannot characterize that activity as economic. *Jenkins*, 909 F. Supp. 2d at 768. Therefore, the government cannot constitutionally apply the HCPA to Hill by relying on the statute's economic nature.

### 2. *The HCPA's Legislative Findings*

The Court next considers Congress's legislative findings. "[C]ongressional findings . . . enable [the court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce." *Lopez*, 514 U.S. at 563. "But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614.

*Morrison* considered legislative findings almost identical to those accompanying the HCPA. In passing the VAWA, Congress found that gender-motivated violence has long tentacles. It deters victims from traveling interstate, from working in interstate business, from transacting interstate business, and from going to places involved in interstate commerce. *Id.* at 615 (citing H.R. Conf. Rep. No. 103–711, at 385 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1803, 1853). This, Congress said, diminishes national productivity, increases medical costs, and decreases the supply of and demand for interstate products. *Id. Morrison* rejected these legislative findings, noting that "[t]he reasoning . . . seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce." *Id.* The Court found this method of reasoning "unworkable if [the Court is] to maintain the Constitution's enumeration of powers." *Id.*

In passing the HCPA, Congress made nearly identical findings regarding how violence based on discriminatory animus substantially affects interstate commerce:

> (A) The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.
> (B) Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.
> (C) Perpetrators cross State lines to commit such violence.
> (D) Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.
> (E) Such violence is committed using articles that have traveled in interstate commerce.

HCPA, Pub. L. No. 111-84, Div. E, § 4702, 123 Stat. 2190, 2835–36 (2009) (codified at 18 U.S.C. § 249 Note). While Congress did not use the exact same language in the HCPA as it did

in the VAWA—presumably based on the lessons learned from *Lopez* and *Morrison*—the flaws remain the same. Just because Congress says something is so does not make it so.

Congress's findings about the HCPA contrast with findings regarding statutes that have satisfied the substantial effects test. For instance, when considering the child pornography statute, 18 U.S.C. § 2252A, Congress found federal control of intrastate child pornography "essential to the effective control of the interstate market in child pornography." *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018) (quoting Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(1)(F), 120 Stat. 587, 624 (codified as amended at 18 U.S.C. § 2251)). Courts have confirmed that "intrastate receipt, production, and possession of child pornography" substantially affect the interstate child pornography market. *Id.* at 89–90 (citing cases). Unlike the receipt and possession of child pornography, Congress could not find intrastate discriminatory violence inextricably and directly linked to a broad interstate market.

Because of the similarities, *Morrison*'s legislative findings evaluation applies here. To accept Congress's findings regarding interstate commerce and the HCPA would allow Congress to regulate virtually any crime. "Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence[.]" *Morrison*, 529 U.S. at 615. Thus, the legislative findings do not provide a basis to find the HCPA constitutional as applied to Hill.

### 3. *The HCPA's Connection to Interstate Commerce*

Courts should also consider a statute's connection to interstate commerce when determining whether the activity that the statute regulates substantially affects interstate commerce. *Id.* at 612. *Morrison* considered the connection between a statute regulating violence based on discriminatory animus and interstate commerce, and found such a connection

insufficient. *Id.* at 615–16. Similarly, the attenuated connection between an assault based on sexual orientation and interstate commerce in this case does not support applying the HCPA to Hill.

The facts revealed at trial support this conclusion. Hill assaulted C.T. while C.T. was pulling items from bins, putting them into boxes, and placing the boxes on a conveyor belt for further processing in another department. This incident occurred within one state, and prevented a victim from completing a shift in which he placed items from bins into boxes. Those boxes then traveled by conveyor belt to other departments for further preparation and shipment. Although C.T. did not return to his shift after the incident, trial testimony indicated that the fulfillment center performed as usual, and other areas of the facility absorbed the work while cleaning crews restored the area where Hill struck C.T. Thus, whether the Court looks at C.T.'s activity of putting items into boxes or Amazon's unaffected performance, any connection between the HCPA violation and interstate commerce is too attenuated to justify applying the statute to Hill.

### 4. *The HCPA's Express Jurisdictional Elements*

The HCPA comes closest to passing constitutional muster as applied to Hill through its jurisdictional element, which requires the offense to interfere with the victim's commercial or economic activity. A jurisdictional element "*may* establish" or "*lend support* to the argument" that Congress validly enacted a statute pursuant to its commerce power. *Morrison*, 529 U.S. at 612–13 (emphasis added). Indeed, the Fourth Circuit has upheld other criminal statutes because they included a jurisdictional element. *United States v. Gibert*, 677 F.3d 613, 626 (4th Cir. 2012) (finding that the jurisdictional hook in an animal fighting statute quells the concerns in *Lopez* and *Morrison*); *United States v. Wells*, 98 F.3d 808, 811 (4th Cir. 1996) ("The existence of this

jurisdictional element . . . under § 922(g)[] distinguishes *Lopez* and satisfies the minimal nexus required for the Commerce Clause."). Nevertheless, "the case law does not suggest that the talismanic use of jurisdictional element language can transform a law otherwise regulating violent activity into a law regulating channels or instrumentalities of interstate commerce." *Jenkins*, 909 F. Supp. 2d at 767; *see also Powell*, 693 F.3d at 402 (finding that the Hobbs Act passes the substantial effects test both because it contains a jurisdictional element *and* because it criminalizes "fundamentally economic" activity).

A jurisdictional element requires proof that the criminal conduct affected interstate commerce. *See Lopez*, 514 U.S. at 561. The jurisdictional element of the offense also merges with the constitutional requirement. *United States v. Rodia*, 194 F.3d 465, 473 (3d Cir. 1999) ("A jurisdictional element is only sufficient to ensure a statute's constitutionality when the element either limits the regulation to interstate activity or ensures that the intrastate activity to be regulated falls within one of the three categories of congressional power."). In this case, pursuant to the amended indictment, the HCPA's jurisdictional hook required the government to prove that the offense interfered with commercial or economic activity "in which the victim [was] engaged at the time of the [offense]." 18 U.S.C. § 249(a)(2)(B)(iv)(I). The jury found Hill guilty, meaning the jurors determined that the government met its burden of proof on this jurisdictional element.

Although the jury necessarily found that Hill's conduct interfered with C.T.'s commercial activity, the jury's finding does not resolve the constitutional question of law—whether the conduct in this case substantially affected interstate commerce. Just because a statute contains a jurisdictional hook does not mean a court can constitutionally apply it to every case and every defendant. *See Jenkins*, 909 F. Supp. 2d 758. If the Court applied the HCPA to Hill, the reach of

the HCPA would barely have an end, as the statute could cover any conduct that occurs anywhere, as long as the government can show that the victim was "engaged" in some sort of economic activity. 18 U.S.C. § 249(a)(2)(B)(iv)(I). This could effectively federalize commercial property, even when the conduct—here, violence based on discriminatory animus—has no connection to the commercial nature of the premises. The HCPA could even extend into someone's home if, for example, they prepared, packaged, and shipped merchandise out-of-state.

The government asserts that Congress can regulate employment, and therefore can regulate the conduct in this case because Hill struck C.T. in the course of their employment. This argument, however, incorrectly supposes that Congress can regulate all workplace conduct. Additionally, it could extend the HCPA into private homes, where many people work. In *Jenkins*, the court noted, "If wholly intrastate non-economic activity can be transformed into conduct that the federal government may punish simply because the defendant used a car or a road to get there," Congress's commerce power would "cast a very large shadow, indeed, and very little activity [would] remain[] in the exclusive province of the police powers of the state." 909 F. Supp. 2d at 773. This notion evokes even more concern if Congress can reach conduct simply because it occurs at a place of employment; at least vehicles and highways are instrumentalities and channels of interstate commerce. Thus, the employment argument does not persuade the Court because it too has no bounds.

Furthermore, to the extent the government argues that interfering with a victim's economic activity affects the broader economy or productivity, *Lopez* has already rejected these "costs of crime" and "national productivity" arguments. 514 U.S. at 564; *see also Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 169 F.3d 820, 838 (4th Cir. 1999), *aff'd sub nom. Morrison*, 529 U.S. 598 (rejecting the notion that "national productivity (including *reduced employment,*

*production*, and demand) . . . ultimately affect[s] the national economy, and presumably interstate commerce as well" (emphasis added)). Although C.T.'s absence from the production line presents a stronger productivity argument than *Lopez* and *Morrison*, the problem remains the same: where such an argument ends. *See Brzonkala*, 169 F.3d at 905 (Wilkinson, J., concurring) (noting that the argument that violence adversely affects the economy could be made regarding all assaults, batteries, and murders). In any event, an argument that C.T.'s brief absence had a substantial effect on the broader economy fails. *See id.* (dismissing the contention that murder removes a productive citizen from the economy).

Although the government proved at trial that Hill's assault satisfied the HCPA's express jurisdictional element, the HCPA must regulate activities that bear a substantial relation to interstate commerce to pass constitutional muster. Hill's case simply does not meet this requirement. Accordingly, as applied to Hill, the HCPA's jurisdictional element does not save the constitutionality of this prosecution because it does not "either limit[] the regulation to interstate activity or ensure[] that the intrastate activity . . . falls within one of the three categories of congressional power." *Rodia*, 194 F.3d at 473.

### III. CONCLUSION

A jury found Hill guilty of violating the HCPA. The Court finds, however, that as a matter of law, the government cannot constitutionally apply the HCPA to Hill. Viewing the facts of this case within the *Lopez* and *Morrison* framework, the HCPA does not regulate an activity—Hill's assault on C.T.—that substantially affects interstate commerce. The HCPA as applied to Hill exceeds Congress's authority under the Commerce Clause, and the Court therefore cannot sustain Hill's conviction. The Court will grant Hill's motion for acquittal.

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 8/15/18
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge